**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

ARTHUR F. ALDERETE,

      Plaintiff,

v.                                                          No. CIV 02-471 LFG

JOANNE B. BARNHART,
COMISSIONER OF SOCIAL SECURITY,

      Defendant.

**MEMORANDUM OPINION AND ORDER
DENYING MOTION TO REVERSE AND REMAND**

Plaintiff Arthur F. Alderete ("Alderete") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Alderete was not eligible for disability insurance benefits ("DIB"). Alderete moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. 11.]

**Background**

Alderete was born on November 8, 1957, was divorced three times and has four children, three of whom are older than 18. He currently is single. He was 43 years old and had an older son living with him when the administrative hearing was held. He has a high school education and was employed by the City from about 1989 until January 3, 2000. His most recent job with the City was as a dump truck driver who followed city street sweepers. [Tr. at 87, 124.]

1

In February 2000, Alderete submitted an application for DIB, claiming an onset date of January 3, 2000, when he suffered a work-related injury. [Tr. at 81, 83.] He claims he is unable to work due to carpal tunnel syndrome, shoulder and back pain and visual problems.

Administrative Law Judge William F. Nail, Jr. held an administrative hearing on August 21, 2001, at which Alderete was represented by counsel. [Tr. at 30.] In a decision, dated September 25, 2001, Judge Nail found that Alderete was not eligible for benefits. Judge Nail specifically determined that Alderete had the residual functional capacity ("RFC") to perform a restricted range of "light" work. [Tr. at 20.] On April 9, 2002, the Appeals Council denied Alderete's request for review. [Tr. at 7.] This appeal followed.

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five. If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[4] at step three,

---

[1] 20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2] 20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3] 20 C.F.R. § 404.1520(b) (1999).

[4] 20 C.F.R. § 404.1520(c) (1999).

the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[6] If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[7] age, education and past work experience, he is capable of performing other work.[8] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[9]

### **Standard of Review and Allegations of Error**

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d

---

[5] 20 C.F.R. § 404.1520(d) (1999). If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity." 20 C.F.R. § 416.925 (1999).

[6] 20 C.F.R. § 404.1520(e) (1999).

[7] One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[8] 20 C.F.R. § 404.1520(f) (1999).

[9] Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

After thoroughly and carefully reviewing the medical records, the ALJ concluded that Alderete was not disabled under the standards of the Social Security Act. [Tr. at 19-20.] In reaching this decision, Judge Nail made the following findings: (1) Alderete did not engage in substantial gainful activity during the pertinent time frame; (2) Alderete had a combination of impairments that were considered "severe" (including his history of carpal tunnel syndrome, mild shoulder impingement syndrome, mildly bulging L4-5 annulus, and diabetes with vision problems related to diabetic retinopathy); (3) these impairments were not severe enough to meet or equal a Listing; (4) Alderete's allegations of his limitations were not totally credible; (5) Alderete retained a RFC to perform a limited range of "light" work; (6) he was unable to perform his past relevant work; (7) vocational testimony supported a finding that there were jobs available both nationally and regionally that

Alderete could perform; and (8) Alderete was not under a disability, as defined by the Social Security Act, at any time through the date of the ALJ's decision. (Tr. at 14-20.)

In this appeal, Alderete generally argues that reversal and remand are required because the ALJ's decision was not supported by substantial evidence and the Commissioner failed to carry her burden of proof or apply correct legal standards to the case. However, Alderete does not contend that the ALJ's credibility determinations or RFC findings were erroneous. His single argument is that the ALJ's step 5 decision was in error because the available jobs identified by the vocational expert are contradicted by the Dictionary of Occupational Titles and that the ALJ failed to clarify the VE's testimony. [Tr. at 12.] The Commissioner argues that the ALJ's decision should be affirmed because substantial evidence supports the ALJ's decision and because the decision is a correct application of the regulations. [Doc. 13.]

After a review of the entire record, this Court finds that the ALJ's decision was supported by substantial evidence, and that there is no error in that decision. Therefore, Alderete's motion to reverse and remand will be denied.

### Summary of Alderete's Work History, Medical Conditions and Treatment

Alderete was a street maintenance worker for ten of his eleven years of employment with the City. [Tr. at 124.] He was on light or restricted duty since about 1994, perhaps because of an injury to one of his hands or his back at about that time. [*See* Tr. at 50, 203.] Although there are no medical records prior to 1999, it appears that Alderete had a cervical fusion in 1984, and injured one of his hands in 1994. [Tr. at 87, 184.]

In 1997, he was referred to the City's Employee Assistance Program with blood pressure and health problems, as well as depression. [Tr. at 121.] He was screened for substance abuse and

5

depression. He claimed that he drank very moderately. [Tr. at 121.] From April through August of 1998, he was off work on hardship leave. He was improved and back to work for awhile, but then his blood pressure was unstable and he was off work during some part of late 1998. [Tr. at 121.] On November 30, 1998, Alderete reported an injury at work that is somewhat reminiscent of the injury allegedly suffered later in January 2000, that precipitated his disability application. In November 1998, he said he was stepping down onto a gas tank/step on his trunk when his foot slipped on diesel fuel and he had to hold himself with a safety bar. He felt pain right away in his right shoulder and left wrist area. [Tr. at 184.]

The 1999 medical records all relate primarily to this November 1998 injury. Generally, the records note that Alderete smoked a pack of cigarettes each day and drank a case of beer each week. He had a history of high blood pressure and had borderline diabetes. [Tr. at 213, 215.] These 1999 records by orthopedic specialists are perhaps most notable for the physicians' observations of inconsistencies and magnification of symptoms by Alderete. [Tr. at 215, 213, 212, 211, 125, 201.] For example, Alderete had an injection on January 8, 1999 from Dr. Atler, but claimed that the numbness had worn off in 45 minutes. Dr. Atler was mystified that the local wore off that quickly when it usually took two hours. Alderete also claimed that the injections made no difference in his pain. [Tr. at 215.]

Alderete's bone scan in 1999 was normal. [Tr. at 213.] His EMG and Nerve Conduction Study showed moderate median neuropathy at his right wrist consistent with carpal tunnel syndrome ("CTS"), but otherwise was normal. [Tr. at 184.] While the study showed no evidence of peripheral nerve problems, Alderete still complained of pain. Symptom magnification was noted by Dr. Bernstein. [Tr. at 212.] On March 11, 1999, Dr. Bernstein suggested surgery to release his carpal

tunnel but advised Alderete that Alderete had symptom magnification. [Tr. at 211.] Dr. Bernstein expected Alderete to return to work in six weeks after the surgery. [Tr. at 211.] The surgery was performed on April 23, 1999. [Tr. at 125.] Alderete improved from the surgery and appeared ready to return to work by late June 1999. [Tr. at 204-08.]

On July 9, 1999, Alderete complained of right shoulder pain. [Tr. at 203.] An MRI showed right shoulder impingement and bursitis. [Tr. at 218.] On July 21, 1999, Alderete told Dr. Atler that he had suffered another injury on July 1, 1999 that he had forgotten to inform Dr. Atler of when he saw him only 8 days later on July 9. He told Dr. Atler that he "got soaked in diesel fuel" and then slipped and fell on the right shoulder. [Tr. at 201.] The medical record indicates that Alderete was making it clear to Dr. Atler that there was a new injury – even though Atler could not figure out why he made the distinction "other than perhaps [as] a technicality with the city." Dr. Atler noted that the MRI of the right shoulder showed "very minimal" impingement. He had full range of motion. [Tr. at 201-02.]

It seems that Alderete was a dump truck driver for about his last year of employment with the City. [Tr. at 124.] His truck had been modified for his work restrictions. [Tr. at 146.] On January 3, 2000, however, he had to drive a different vehicle, without modifications, while his truck was repaired. [Tr. at 149, 146.] The unmodified truck required that he climb a higher step to get into the cab, and he had difficulties getting in and out of the truck. [Tr. at 146.] Because of this he began having pain in his lower back and right shoulder. [Tr. at 149.] Alderete actually alleged at the administrative hearing that he slipped on January 3. [Tr. at 49.]

Alderete appeared to have visited Dr. Aragon at the Los Lunas medical facility on January 3, the day he began having problems at work. The medical progress report notes erectile dysfunction,

7

unstable balance and worsening vision, but nothing about work-related pain or problems that day. Alderete was on two medications then – Avapro and Zinc. He was getting and requesting medicine samples from the physician. [Tr. at 273, 189.] On January 4, 2000, Dr. Aragon filled out a return to work ("RTW") authorization for full duty, without any restrictions. [Tr. at 271.] Perhaps the RTW related to the November 1989 accident.

On January 6, 2000, Alderete was seen by Dr. Zaenger, a physician with the City's Employee Health Center. Alderete discussed the problem with his unmodified truck and pain in his back and right shoulder. [Tr. at 149.] However, the examination on January 6 showed no evidence of significant muscle spasm or a definite gait problem. Any gait problem he had that day was observed as intermittent during the exam. Alderete was not bent forward, and his lateral bending was "fairly good." His extension was mildly restricted, and his range of movement was "quite good" in all parameters of his shoulder. He was given a prescription of Vicodin (#20) "to use sparingly." Dr. Zaenger placed him on sedentary status for work. [Tr. at 149.]

Four days later, on January 10, Alderete saw Dr. McKenzie, another physician with the City's Employee Health Center. Dr. McKenzie re-filled his Vicodin (#20) prescription. [Tr. at 146.] He also was out of Amitryptiline (for sleep) and had it re-filled. He exhibited mild tenderness to his right shoulder and a moderate spasm of his upper lumbar. Dr. McKenzie referred him to myofascial therapy to decrease the muscle spasm, and started him on Orphenadrine (muscle relaxant). Dr. McKenzie hoped to have him back to work soon. [Tr. at 146.]

Four days later again, on January 14, Alderete saw Dr. Kelemen, another physician at the City's Employee Health Center. Dr. Kelemen also re-filled the Vicodin (#20), as well as the prescription for Orphenadrine. Alderete was too uncomfortable to do light duty. [Tr. at 145.] On

8

January 19, the Vicodin was again re-filled and he was changed to Cyclobenzaprine for the muscle relaxant since the previous relaxant had not helped. [Tr. at 144.] The Vicodin was re-filled on January 31, February 10 and February 23 as well. [Tr. at 140-42.]

In January 2000, Alderete began myofascial therapy but had limited satisfaction. [Tr. at 133, 131.] In February 2000, he stopped the myofascial therapy and began regular physical therapy. [Tr. at 141.] Some of the physical therapists' notes from February and March 2000 show that Alderete presented with "very exaggerated pain behavior" and inconsistencies. [Tr. at 168, 163, 162, 155.] His pain consistently worsened, with the physical therapy. [Tr. at 153, 154, 155, 156, 157.]

On February 7, 2000, Alderete visited Dr. Gelinas, an orthopedic specialist with New Mexico Spine. [Tr. at 176.] It was noted that Alderete was taking Hydrocodone four times a day, sleep medication and muscle relaxers. He was on blood pressure medication. He had no significant standing or sitting intolerance and could walk without difficulty and with a normal gait. He was to remain off work and Dr. Gelinas hoped that Alderete could return to work by next month's medical appointment. [Tr. at 176.]

Three days later, on February 10, Alderete saw Dr. McKenzie. He was walking stopped forward. [Tr. at 141.] In mid-February 2000, Alderete applied for DIB. [Tr. at 81, 83.]

On March 6, 2000, Dr. Gelinas noted Alderete's complaints of pain in his thoracic and lumbar spine and significant pain radiating into his groin. X-rays indicated no evidence of any hip pathology or abnormalities. [Tr. at 173.] On March 21, Dr. McKenzie filled out a statement for Alderete's application of disability benefits on a Public Employee Retirement Association ("PERA") form. He stated that Alderete was on permanent restriction and that he would like to get Alderete back to work in a sedentary position with significant lifting and mobility restrictions. [Tr. at 296.]

9

Dr. Gelinas had ordered a MRI of Alderete's lumbar spine. The results indicated that his lumbar vertebral bodies were "essentially normal." There were no herniated discs or central canal stenosis. There was mild central bulging annulus at L4-5 without evidence of herniation. The remaining levels were free of bulge or herniation. As compared with Alderete's August 1995 MRI, there were no significant interval changes. [Tr. at 180.] Dr. Gelinas stated that the MRI "essentially really shows minimal degenerative changes . . . ." [Tr. at 172.] He gave him a 5% rating impairment and stated he believed Alderete could function in a light duty level as of April 10, 2000. [Tr. at 172.]

The Social Security Administration denied his claim for benefits, finding that his condition was not expected to remain severe for 12 months. He should be able to return to work by January 2001. [Tr. at 64.]

On April 12, 2000, Dr. Atler saw Alderete in relation to pain and swelling in his right hand and pain and locking of his right shoulder. Alderete said that he felt his prior CTS surgery on his right hand had not worked. However, the x-ray that day showed his wrist looked fine. [Tr. at 199.] Dr. Atler ordered a repeat nerve conduction test.

On an April 24 disability form, Alderete essentially said he was unable to engage in any type of activities and was in constant pain. He supposedly used a cane 80% of the time. [Tr. 101-107.]

On April 28, 2000, 18 days after Dr. Gelinas noted that Alderete could function at a light level, he provided a PERA statement of disability saying that Alderete was "poor for recovery and poor for return to work." The form notes that Alderete could not return to work. [Tr. at 302.]

On May 11, 2000, the repeat nerve study was conducted and was "entirely normal." There was no evidence of recurrent CTS and the previously noted abnormalities in February 1999 were resolved. [Tr. at 182.]

On May 24, 2000, Dr. Atler noted that Alderete's lab work was all negative except for polycythemia which was noted. Polycythemia is an increase in total red cell mass of blood. Dr. Atler recommended that Alderete stop smoking and see his family doctor for this condition. Alderete was still complaining of pain and numbness in his right hand. Dr. Atler commented that "the explanation for this is somewhat elusive," in view of his normal nerve conduction studies. [Tr. at 197.] There was "absolutely no indication for further hand surgery and Alderete was not a good candidate for shoulder surgery. Dr. Atler did not believe he could assist Alderete further. Alderete's diabetes was noted as borderline. [Tr. at 197.]

Dr. Atler wrote a letter to the City's Senior Adjustor in response to an inquiry about Alderete. [Tr. at 195.] Dr. Atler stated that he was not temporarily totally disabled due to impingement of his right shoulder, but gave Alderete a 12% impairment of his right upper extremity or 7% impairment of his whole person. Dr. Atler stated that there were "numerous inconsistencies in his presentation." [Tr. at 195.] For example, Alderete failed to respond to local injections, failed to acknowledge any response to the injections, had ongoing complaints of carpal tunnel despite normal studies.

On June 8, 2000, Dr. Bernstein saw Alderete regarding his hand. Alderete said he could not use his hands for normal activities but callouses were observed on his hands. [Tr. at 194.] Thus, the physical evidence was inconsistent with Alderete's statements. Dr. Bernstein was not certain what he could offer. Alderete might have beginning arthritis.

On June 20, Dr. Gelinas noted that Alderete had so many medical problems that he was unsure if he was "actually employable." Dr. Gelinas had given him a light duty restriction but stated one had to consider the whole picture with his significant problems with his hands, upper extremities and shoulders. [Tr. at 242.]

11

Dr. Aragon noted Alderete's diabetes was borderline in June 2000 and referred him to Dr. Lovato for vision loss. [Tr. at 249.] In July, Alderete reported to Dr. Aragon that Dr. Lovato indicated he needed to get his diabetes "under control." [Tr. at 267.] A July 26 record from Dr. Lovato notes "diabetic retinopathy." [Tr. at 241.]

On August 29, 2000, Dr. McKenzie signed a city physical evaluation for 45 day light duty work. Dr. McKenzie stated that Alderete had permanent restrictions but could sit 5 hours, drive 3 hours, walk 2 hours and stand 1 hour. He could return to light duty work. [Tr. at 243.]

In November, Alderete told Dr. Lovato that he still could not see well out of his glasses and did not know why. [Tr. at 256.] Alderete told Dr. McKenzie that his vision was getting bad, but he was not on any medications for diabetes as of November 13, 2000. [Tr. at 263.] On November 22, Dr. Aragon provided a PERA statement of disability that said Alderete was unable to participate in many activities due to his "degenerative arthritis." He was unable to work for the same reason. [Tr. at 260.] There are no objective test results indicating degenerative arthritis.

On February 20, 2001, Alderete was seen by Dr. Ferraro with Southwest Endocrinology Associates. Dr. Ferraro noted Alderete's Type 2 diabetes that was initially diagnosed in November 1999. Alderete was not monitoring his blood sugars and had a history of alcohol use. He said he drank on weekends and that he usually consumed 12 beers on Sundays. He had no blurry vision complaints as of this date. Dr. Ferraro found that his hemoglobin result indicated "excellent glycemic control" and that it was unlikely that he would be experiencing any complication of diabetes based on that result and because his diagnosis of diabetes was rather recent. His hypertension was adequately controlled. [Tr. at 251.]

Notwithstanding these findings, Dr. Aragon wrote a letter on behalf of Alderete stating that Alderete was unable to work due to "uncontrolled hypertension and severe pain from arthritis." [Tr. at 258.] Alderete's attorney wrote to the ALJ before the hearing noting that Alderete's condition was permanent and no improvement was expected. His high blood pressure and diabetes were "out of control." [Tr. at 115.]

At the August 21 hearing, Alderete testified that he could not see well and used a cane, although he did not have the cane with him that day. [Tr. at 35.] His back was "messed up" and he had shooting pains down his leg. He could drive since he was in arrears on child support payments. [Tr. at 40.] He also said he could not drive because he was scared due to vision problems. [Tr. at 59-60.] He engaged in no activities other than watching TV. [Tr. at 42.] He typically lay down at least three times a day for hours at a time. [Tr. at 60.] His 19-year old son was living with him to help him. He could only give himself sponge baths, although he did try to walk a little every day. He was able to take care of his personal needs and dressing, etc., but it was difficult. [Tr. at 44.] He could not use his hands well. He still smoked and drank. It was unclear whether he drank 12 or 24 beers every week. [Tr. at 47.]

## Discussion

Alderete appropriately does not challenge Judge Nail's credibility determinations. The records are replete with reports of exaggerated symptoms and inconsistencies and doubts by some of the physicians as to Alderete's credibility. Moreover, based on the objective medical evidence in the record, Alderete's reports of his own limitations are simply unbelievable.

Alderete contests only one aspect of the ALJ's decision – that the vocational expert's identification of specific available jobs that Alderete could perform are contradicted by the definitions

13

of those jobs in the Dictionary of Occupational Titles ("DOT") and that the ALJ did not adequately resolve the conflicts between the VE's testimony and information in the DOT. Thus, Alderete contends that the ALJ's step 5 analysis was in error and not supported by substantial evidence.

When a conflict exists between VE testimony and the DOT, the ALJ must investigate and elicit a reasonable explanation for the discrepancy before relying upon the VE testimony. Haddock v. Apfel, 196 F.3d 1084, 1089 (10th Cir. 1999). "[A]n ALJ has a duty to fully develop the record even when the claimant is represented by an attorney, as in this case. Questioning a vocational expert about the source of his opinion and any deviations from a publication recognized as authoritative by the agency's own regulations falls within this duty." Id. at 1091 (internal citation omitted). Moreover, Social Security Ruling 00-4-p imposes an affirmative duty on the ALJ to inquire about actual and apparent conflicts between VE testimony and the DOT information. Frazee v. Barnhart, __ F. Supp. 2d __, 2003 WL 1984472 at *13 (D. Kan. Apr. 28, 2003).

Here, the ALJ asked the VE to consider an individual who was limited to a light range of work, could not lift over-head or over his shoulder, needed to alternate between sitting and standing about every 30 minutes to an hour, could not do jobs requiring fine finger dexterity, could not, for example, handle coins on a continual basis, and had vision restrictions. He could not work in a job that required acute eyesight. [Tr. at 51-53.] The ALJ further explained that the positions could require driving and vision for most normal activities, "just not for something that requires acute eyesight. Fine, you know, small figures, or small parts where an individual needs very acute eyesight to be able to see what's happening." [Tr. at 53.] Alderete's attorney does not challenge the limitations as presented to the VE by the ALJ's hypothetical.

After having the VE clarify its hypothetical, the VE identified a few positions, with their DOT code numbers, that met these parameters, including a ware cleaner (helps clean and finish clay and porcelain products), food delivery driver, and coin machine collector, all of which were light level, unskilled work.

The ALJ also asked whether Alderete could perform any sedentary occupations, based on the hypothetical. The VE believed that the sedentary occupations would require more visual acuity of finger dexterity than the hypothetical allowed. [Tr. at 54.]

At that point, Alderete's attorney asked the VE several questions, including his alleged inability to drive and his need to alternate positions every 20 minutes. [Tr. at 55.] The VE testified that Alderete could still perform the ware cleaner position, without needing to drive. If Alderete could drive, but needed to alternate positions every 20 minutes, the VE believed he could perform all three of the identified positions. If Alderete could not drive and had to stand for more than a few minutes before sitting (every 20 minutes), he would not be able to do the ware cleaner job. [Tr. at 56.]

The ALJ next asked the VE to review Dr. McKenzie's August 2000 physical evaluation for Alderete. On the form, Dr. McKenzie limited Alderete permanently to lifting/carrying 15 pounds every 2 hours, walking 2 hours, standing 1 hour, sitting 5 hours, and driving 3 hours. [Tr. at 243] Based on this information, the VE first eliminated the ware cleaner position that required lifting 20 pounds. The VE further testified that several sedentary positions might be available, including a surveillance systems monitor job if his vision was adequate enough and a gate guard position, that is semi-skilled.

15

Alderete's attorney followed up with additional questions regarding these positions. [Tr. at 58-59.] The VE explained that the surveillance position would allow for standing and resuming sitting. Alderete's attorney also asked if there were any positions he could perform if he had to lie down throughout the day. The VE testified, under that hypothetical, all work would be eliminated. [Tr. at 59.]

Alderete claims that the requirements of all five positions are beyond his capabilities and/or have requirements that conflict with the ALJ's RFC findings. The government now concedes that the food delivery driver position had a medium RFC that did not meet the light RFC requirement. However, this makes no difference since the Commissioner need only establish that the claimant can perform some specific occupation or occupations --"however few in themselves . . . ." Evans v. Chater, 55 F.3d 530, 532 (10th Cir. 1995) (*citing* 20 C.F.R. § 404.1566(b)). Thus, the Court analyzes several of the other positions at issue below.

### A.     Ware Cleaner Position

A ware cleaner smooths the surface of pressed, cast, or glaze-dipped clay products to remove flash, cracks and loose materials, using fingers, pick knife, sponge or sandpaper. He smooths hardened surfaces, using sandpaper, and wipes fingers over glazed surfaces to distribute glaze evenly over checks and cracks prior to firing. Alderete argues that the position requires frequent reaching, frequent near acuity, and finger dexterity consistent with the middle 1/3rd of the population, none of which he can perform. DOT 774.687-022. Alderete also asserts that the ALJ was required to ask the VE about this conflict with the DOT information.

The Court disagrees. Frequent reaching does not mean that Alderete was required to reach over head or over his shoulder as stated in the ALJ's hypothetical to the VE. Indeed, it is conceivable that a ware cleaner's reaching activities may be either below or in front of him.

Similarly, the requirement of frequent near acuity does not appear to conflict with the information provided in the hypothetical, at least not with respect to the duties of a ware cleaner. The ALJ told the VE that Alderete could not do jobs that demanded "very acute eyesight," for example work with small figures or small parts. The work of a ware cleaner, as described by the DOT definition, does not require this type of acute vision. Moreover, Alderete's corrected visual acuity in November 2000 of 20/40-20/30, does not support an argument that he would not be able to do a ware cleaner's job. In addition, a more recent medical record from February 2001 indicates he had no blurry vision complaints. [Tr. at 251.]

Alderete's argument that he did not have the finger dexterity required for the ware cleaner position also fails. The ALJ told the VE that Alderete could not perform jobs requiring fine finger dexterity. The ware cleaner DOT provides a requirement for a medium level of finger dexterity which is in keeping with the general description of the job. Moreover, the objective medical evidence indicates that Alderete's CTS surgery was a success, and his repeat nerve conduction studies were normal. While he told doctors he virtually could not use his hands at all, his reports were noted as inconsistent with the callouses on his hands.

The Court concludes that substantial evidence supports the finding that Alderete was able to perform the functions of a ware cleaner.

17

### B.     Coin-Machine Collector

A coin-machine collector collects coins or coin boxes from parking meters or telephone pay stations. Alderete argues that its requirements for frequent reaching and occasional near acuity conflict with the ALJ's RFC finding. DOT 292.687-010. The Court again disagrees, for essentially the same reasons as set forth under the discussion of ware cleaner. Frequent reaching does not mean that Alderete would be required to reach over his head or shoulders, nor does the Court read the DOT job definition to require such activities. In addition, the hypothetical did not indicate that Alderete was unable to perform jobs of this nature that require occasional near acuity. Moreover, Alderete's reference to Dr. Aragon's medical record showing that Alderete could not read with his bifocals does not constitute objective findings by the doctor. Instead, the notation appears to reflect only Alderete's subjective complaint. [Tr. at 255.] Similarly, Alderete's reference to the City's EAP note stating his vision was too blurred to drive is of little assistance because the note seems to relate to a problem in 1997. [Tr. at 121.]

Thus, the Court finds there is substantial evidence to support the ALJ's finding that Alderete could perform the duties of a coin-machine collector.

### C.     Surveillance-System Monitor

This position is described as follows: monitors premises of public transportation terminals to detect crimes or disturbances, using closed circuit TV monitors, and notifies authorities by telephone of need for corrective action. Pushes hold button to maintain surveillance of location where incident is developing. Adjusts monitor controls when required to improve reception. Alderete claims that he cannot perform this position because it requires frequent near acuity. DOT 379.367-010.

Again, as described by the ALJ, Alderete was limited in being able to work with very small figures or parts. This position does not appear to require that type of very acute vision, and for this reason the job requirements do not conflict with the VE's testimony. Indeed, the evidence indicates that Alderete was able to sit for hours at a time while watching television and likely utilized television control devices which generally call for the pressing of small buttons or controls.

Thus, the Court concludes that substantial evidence supports the ALJ's finding that Alderete could perform this type of position.

IT IS THEREFORE ORDERED that Alderete's Motion to Reverse and Remand for a Rehearing [Doc. 11] is denied for the reasons stated herein and that this matter is dismissed, with prejudice.

_____<br>
Lorenzo F. Garcia<br>
Chief United States Magistrate Judge